IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| JERRY L. HYSMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:10cv18-CSC |
| | ) | (WO) |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I.  Introduction**

The plaintiff, Jerry L. Hysmith ("Hysmith"), applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and supplemental security income benefits pursuant to Title XVI, 42 U.S.C. § 1381 *et seq.*, alleging that he was unable to work because of a disability.  His application was denied at the initial administrative level.  Truitt then requested and received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ also denied the claim.  The Appeals Council rejected a subsequent request for review.  The ALJ's decision consequently became the final decision of the Commissioner of Social Security ("Commissioner").[1]  *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  The case is now before the court for review pursuant to 42 U.S.C. § 405(g) and § 1631(c)(3).  Based on the court's review of the record in this case

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

and the briefs of the parties, the court concludes that the decision should be reversed and

remanded to the Commissioner for further proceedings.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. . . .

To make this determination,[2] the Commissioner employs a five-step, sequential

evaluation process.  *See* 20 C.F.R. § 404.1520, §416.920.

> (1)  Is the person presently unemployed?
> (2)  Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4)  Is the person unable to perform his or her former occupation?
> (5)  Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[3]

The standard of review of the Commissioner's decision is a limited one.  This court

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

[3] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986), is a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker,* 651 F.2d 408 (5th Cir. 1981) (Unit A).

must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III.  Administrative Proceedings

Hysmith was 35 years old at the time of the hearing before the ALJ. (R. 21.) He completed the eighth grade. (R. 22.) Hysmith's prior work experience includes working as a poultry laborer, bundle breaker, and cashier. (R. 43.) Hysmith alleges that he became disabled on October 4, 2005, due to suffering from bipolar depression, a personality disorder, sleep apnea, joint pain, back pain, anxiety, dizzy spells, a heart condition, rheumatoid arthritis, dysautonomia, and chronic obstructive pulmonary disease. (R. 22, 28, 36, 39-41, 83-84, 86, 88, 90.) Following the hearing, the ALJ concludes that Hysmith suffers from a severe impairment of cardiac arrhythmia and non-severe impairments of history of anxiety disorder

3

and bipolar disorder.  (R. 12.)  The ALJ determined that Hysmith is able to perform his past relevant work as a cashier and poultry worker.  (R. 16.)  Accordingly, the ALJ concluded that Hysmith was not disabled.  (R. 17.)

### IV.  The Plaintiff's Claims

As stated by Hysmith, he presents the following issues for the court's review:

(1)    The Commissioner's decision that Hysmith does not even suffer from a minimally severe mental impairment and does not have more than mild mental functioning limitations is contrary to substantial evidence and is based on a mistake of fact that Hysmith was not receiving treatment for his mental condition.

(2)    The Commissioner erred in crediting the opinion of a one-time examining physician (Dr. Vyas) over the opinion of Hysmith's long-time treating specialist.

(Doc. No. 14, Pl's Brief, p. 1.)

### V.  Discussion

The plaintiff raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence.  *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987).  However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the Commissioner erred as a matter of law, and thus, this case is due to be remanded for further proceedings.  Specifically, the court finds that the Commissioner failed to properly consider Hysmith's depressive disorder NOS, personality disorder NOS, prolonged posttraumatic stress disorder, and panic disorder as severe impairments and failed to properly consider the opinions of the consultative psychologists' diagnoses of mental

4

impairments separately and in combination, failed to properly consider a medical specialist's opinion that Hysmith's heart condition, dysautonomia, and other medical problems severely impact his ability to perform work, failed to develop the record with respect to Hysmith's dysautonomia, and failed to consider Hysmith's inability to afford medical treatment.

## A.  Mental Impairment

Hysmith argues that the ALJ's conclusion that he suffered from no more than mild mental functioning limitations and that his mental impairments were non-severe is not supported by the evidence. Specifically, he asserts that the ALJ's determination that his depression and personality disorder are not severe is contrary to the opinions of the consultative and treating physicians.

When deciding whether Hysmith's depressive disorder and personality disorder were non-severe impairments at step two of the sequential evaluation, the ALJ determined as follows:

> The claimant's medically determinable mental impairments of history of anxiety disorder and bipolar disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore nonsevere.

> In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix I).

> These four broad functional areas are known as the following:

> (1) Activities of daily living.  The undersigned finds that he has "mild" limitations in this area of functioning.  The claimant has stated that he has experienced depression since age 16; however, he has shown that he has been

capable of working full time, even beyond his alleged onset date (Exhibit 1E). Furthermore, the claimant testified at the hearing that he can handle money and pay his bills.

(2) The next functional area is social functioning.  In this area, the claimant has mild limitations.  The claimant testified that he likes to keep away from people. He reported to Dr. McKeown that he did not want to be around other people and felt closed in when inside of buildings. Dr. McKeown stated, however, that he was malingering (Exhibit 16F).

. . . [T]he claimant's mother reported on a Third Party Daily Activities Questionnaire dated February 13, 2007 that the claimant lives with his sister's family.  (Exhibit 5E).

The claimant acknowledged on a Work Activity Report that he . . . had worked from November 2005, through March 19, 2006, becoming a full time employee until he quit working on December 8, 2006.  (Exhibit 1E).  This degree of functionality conflicts with the claimant's allegations of pain and mental limitations.  He had full employment for over a year beyond his alleged onset date (Exhibit 1E).  At the hearing, the claimant stated that he left his work as a poultry worker because he had to breathe in ammonia, not due to an inability to get along with others.

(3) The third functional area is concentration, persistence or pace.  In this area, the claimant has mild limitations.   Despite the claimant's symptom magnification, Dr. McKeown reported that the claimant was able to recite the alphabet, and count backwards, performed simple addition and subtraction. Although he had some difficulty with math and long division, the undersigned notes that he has an 8th grade education (Exhibit 16F).  The claimant testified that he reads the newspapers and the Bible, writes letter.

(4) The fourth functional area is episodes of decompensation.  In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.  Neither the claimant nor Dr. McKeown indicated that he experienced any such episodes (Exhibit 16F).

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

(Doc. No. 16-2, pp. 12-13.)

The severity step is a threshold inquiry which allows only "claims based on the most trivial impairment to be rejected." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). Indeed, a severe impairment is one that is more than "a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987) (citing with approval Social Security Ruling 85-28 at 37a).

A physical or mental impairment is defined as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. § 1382c(a)(3)(c).  The plaintiff has the "burden of showing that his impairments are 'severe' within the meaning of the Act." *McDaniel*, 800 F.2d at 1030-31.   Once the plaintiff establishes that he suffers from a severe impairment, the ALJ is not entitled to ignore that evidence.  Here, the ALJ concluded that Hysmith's mental impairments were not severe based solely on his conclusion that Hysmith had no more than mild limitations in the first three functional areas and no episodes of decompensation.

Proper consideration of the medical records, however, indicate that Hysmith suffers from several psychological impairments.  On January 30, 2006, Dr. Doug McKeown, a clinical psychologist, conducted a consultative examination of Hysmith.   During the evaluation, Dr. McKeown noted that Hysmith "at times appear[ed] to embellish his symptoms significantly."   (R. 464.)   Although Dr. McKeown initially diagnosed Hysmith as

7

"malingering," he also diagnosed the plaintiff as suffering from depressive disorder NOS and personality disorder NOS. (R. 466.) In addition, Dr. McKeown "recommended to [Hysmith] that he continue in counseling and follow-up with the local mental health clinic to see if regular treatment and perhaps even evaluation of medication would be appropriate." (*Id*.)

The ALJ relied on Dr. McKeown's diagnosis of malingering as evidence that Hysmith's depressive disorder NOS and personality disorder NOS are not severe. Dr. McKeown's report, however, indicates that his diagnoses of depressive disorder NOS and personality disorder NOS are separate and distinct from his diagnosis of malingering. The ALJ must consider every impairment alleged by Hysmith and determine whether the alleged impairments are sufficiently severe - either singularly or in combination - to create a disability. *See Gibson v. Heckler,* 779 F.2d 619, 623 (11th Cir. 1986).

The ALJ likewise failed to consider the opinion of Dr. Fred George, a clinical psychologist, when determining that Hysmith's mental impairments are non-severe. Upon conducting a consultative examination on March 12, 2007, Dr. George diagnosed Hysmith as suffering from prolonged posttraumatic stress disorder, panic disorder, and major depression, single episode, severe with psychotic features. (R. 522.) The psychologist noted that Hysmith was motivated and cooperative throughout the testing and that the evaluation was valid. Dr. George also determined that Hysmith would be unable to persist in a job setting, cope with job stresses and job changes, or relate to co-workers, supervisors, and members of the general public because of his level of anxiety and mood disturbance. (*Id*.) Dr. George recommended that Hysmith be referred to a mental health center for evaluation

and treatment of his depression and anxiety and obtain medication through programs available through the drug companies. (*Id.*)

The ALJ made reference to some of Dr. George's findings in his summary of the evidence; the ALJ, however, did not specifically discuss the consultative physician's opinion that Hysmith suffers from prolonged posttraumatic stress disorder, panic disorder, and major depression, single episode, severe with psychotic features. Moreover, the ALJ ignored Dr. George's opinion that Hysmith would be unable to persist in a job setting, cope with job stresses and job changes, or relate to co-workers, supervisors, and members of the general public, as well as his recommendation that Hysmith be referred to a mental health center for evaluation and treatment of his depression and anxiety and obtain medication through programs available through the drug companies, when determining that Hysmith's mental impairments are non-severe. (*Id.*) The ALJ is not free to simply ignore medical evidence, nor may the Commissioner pick and choose between the records selecting those portions which support his ultimate conclusion. Rather, the ALJ must consider it and explain the weight he gives to it. *See* S.S.R. 96-6p.

Because the ALJ failed to consider the consultative psychologists' diagnoses of mental impairments separately and in combination and ignored Dr. George's opinion that Hysmith's mental condition would prevent him from persisting in a job setting, the court cannot conclude that the ALJ's opinion that Hysmith's mental impairments are non-severe is supported by substantial evidence.

More importantly, the Commissioner failed to consider Hysmith's inability to afford

9

medical treatment when determining that Hysmith has the residual functional capacity to return to his past work as a cashier and poultry worker.  The Commissioner did not discuss the consultative physicians' and a counselor's recommendations that Hysmith receive continued mental health treatment.  Moreover, he discredited Hysmith's allegations of mental problems based on the lack of medical treatment.  While failure to seek treatment is a legitimate basis to discredit the testimony of a claimant, it is the law in this circuit that poverty excuses non-compliance with prescribed medical treatment or the failure to seek treatment. *Dawkins v. Bowen*, 848 F.2d 1211 (11th Cir. 1988).  During the hearing, Hysmith testified that he does not have health insurance and cannot afford medical treatment, that the county health department will not assist him, and that he take samples of Lexapro when they are available. (R. 26-28, 87.)  In a July 28, 2008, letter from Lighthouse Counseling, a counselor recommended that "[i]t would be in the best interest of Mr. Hysmith to continue with mental health treatment, as well as to have specific medication evaluated by a psychiatrist."[4]  (R. 636.)  The counselor noted that "since he has no insurance [or] income at this time his options are limited.  Even the community mental health center requires some payment for him to [see a] specialist."  (*Id*.)  She further concluded that "his emotional status at this time would prevent him from obtaining or maintaining gainful employment."  (*Id*.)  In addition, the

---

[4]  After the ALJ entered his decision to deny benefits, Hysmith submitted additional evidence, including the July 28, 2008 letter from Lighthouse Counseling.  The Appeals Council concluded that the additional information did not provide a basis for changing the ALJ's determination. (R. 4.)  Thus, the proper inquiry is whether the Appeals Council's decision to deny benefits is supported by substantial evidence in the record as a whole, including the evidence submitted to the Appeals Council.  *See Ingram v. Astrue*, 496 F.3d 1252, 1262-64 (11th Cir. 2007).

medical records are replete with references to Hysmith's inability to afford medical treatment. For example, on March 3, 2007, an emergency room physician noted that Hysmith was unable to afford medication. (R. 514.) On March 12, 2007, Dr. George also noted that Hysmith was unable to afford medication, that he should seek assistance through available drug company programs, and that he should be referred to a mental health center for evaluation and treatment of his depression and anxiety. (R. 521-22.) In a June 2007 letter, Dr. Darius G. Aliabadi, a cardiologist, stated that Hysmith is unable to afford any of his medications. (R. 512.) On November 17, 2008, Dr. Aliabadi also noted that Hysmith is unable to afford Lexapro and provided samples. (R. 589-90.) Despite the mental health experts' recommendations concerning the need for continued mental health treatment and notations indicating Hysmith was uninsured and could not afford treatment, the Commissioner failed to consider whether Hysmith's financial condition prevented him from seeking medical treatment. Thus, this court cannot conclude that the Commissioner's discrediting of Hysmith based on his failure to seek treatment is supported by substantial evidence.

## B.  The Treating Physician's Opinion

Hysmith asserts that the ALJ improperly discounted the opinion of Dr. Darius G. Aliabadi. Specifically, Hysmith argues that the ALJ should not have accorded more weight to the opinion of Dr. Vijay C. Vyas, a consultative physician, than to the opinion of his treating physician, Dr. Aliabadi.

The law is well-settled;  the opinion of a claimant's treating physician must be accorded substantial weight unless good cause exists for not doing so. *Jones v. Bowen*, 810

F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985).

However, the weight afforded to a physician's conclusory statements depends upon the extent

to which they are supported by clinical or laboratory findings and are consistent with other

evidence of the claimant's impairment. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir.

1986). The ALJ "may reject the opinion of any physician when the evidence supports a

contrary conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The

ALJ must articulate the weight given to a treating physician's opinion and must articulate any

reasons for discounting the opinion. *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).

The ALJ discounted Dr. Aliabadi's opinion regarding the severity of Hysmith's

impairments. Specifically, the ALJ found that Dr. Aliabadi's opinion that Hysmith's

symptoms of severe weakness, dizziness, and shortness of breath are permanently disabling

should be afforded no weight for the following reasons:

> Dr. Allabadi [*sic*] did not diagnose the claimant as having a current
> impairment. In fact, he stated that he had a "history" of several heart related
> impairments to include mitral value [*sic*] prolapse. He added, however, that
> claimant was not getting his prescriptions due to financial reasons (Exhibit
> 23F).

> Additional treatment notes from Heart South P.C. dated November 17,
> 2008, indicated that the claimant had complaints of coughing and dyspepsia;
> however, he conceded that he continued to abuse tobacco. The claimant denied
> having asthma, wheezing, nocturnal dyspnea, tachypnea and hemoptysis (See
> Exhibits 34F, 35F and 36F). The claimant reported to Dr. Vyas on March 29,
> 2009 that in the year 2000, he had a history of heart trouble which he described
> as chest pain and that he had experienced a syncope episode in 2005. He stated,
> however, that currently he has no chest pain. (Exhibits 34F and 35F).

> Hollie Crutchfield, a nurse with Heart South, reported on November 12,
> 2008, that from a cardiac stand point, the claimant was stable (Exhibit 36F).

(R. 16.)

Sometimes in a Social Security disability case the court wonders whether the administrative record which the court reviews is the same record the ALJ reviewed. First, the ALJ's determination that a cardiac specialist did not diagnose Hysmith with a current impairment is not supported by substantial evidence. Although the ALJ discusses Hysmith's history of mitral valve prolapse and one syncope episode, he disregards other evidence indicating that Hysmith suffered from fainting spells and weakness on a *recurrent* basis and that he suffers from a variety of chronic cardiovascular problems, including dysautonomia. For example, on October 4, 2005, Hysmith was admitted to the emergency room at Wiregrass Medical Center with complaints of falling earlier that morning, weakness, difficulty breathing, and tightness in his chest, as well as nausea and diarrhea. (R. 389.) Dr. John Simmons noted that Hysmith was somewhat hypotensive with blood pressure around 92/50 and bradycardic. (R. 388.) In addition, the physician noted that medical personnel administered "Donnatal B.I.D. to increase his heart rate to no avail." (R. 387.) Dr. Simmons also noted his concern "with a young man who has no significant athletic activity that is this bradycardic and also with two syncopal episodes prior to admission following apparent bradycardia" and ordered his transfer to Southeast Medical Center for treatment by a cardiologist. (R. 387.)

On October 7, 2005, Hysmith was transferred to the Southeast Alabama Medical Center for additional treatment and testing. On October 10, 2005, Dr. David D. Gayle, a cardiologist and clinical cardiac electrophysiologist, conducted an examination, noting the following impressions:

(1) Dysautonomia: He probably has vasovagal events, as have been noted many times in the past.  He has a classic exam and history for mitral valve prolapse disorder.  It is not uncommon to find males with this disorder with significant dysautonomia and even "caricatures" of the syndrome.  I doubt that pacing will resolve his symptoms, and I would reserve this only for clearly symptomatic pauses or bradycardia.  He may benefit, however, from vagolytic agents.

(2) Anxiety: As often the case in patients with significant dysautonomia, anxiety can be a mediator of adrenaline, which can be a trigger for reflect autonomic events and vasovagal syndrome.  I would favor considering the possibility of psychiatric intervention for his anxiety syndrome.

(R.. 418-19.)  The following day, Hysmith was discharged from the hospital by Dr. Aliabadi with diagnoses of mild sinus bradycardia, headaches, questionable migraine and other problems, including syncope, right bundle branch block, and a history of mitral valve prolapse with dysautonomia and probably vasovagal events.  (R. 412.)

In a January 29, 2007, letter, Dr. Darius G. Aliabadi stated that Hysmith has a history of recurrent episodes of severe weakness, dizziness, shortness of breath, and syncopal episodes that are felt to be secondary to dysautonomia, as well as mitral valve prolapse, right bundle branch block, bradycardia, and anxiety disorder.  (R. 512.)  Dr. Aliabadi concluded that due to Hysmith's continued complaints of severe weakness, dizziness, and dyspnea, he should be considered permanently and completely disabled.  (Id.)

On March 23, 2007, Hysmith was admitted to Wiregrass Medical Center with complaints of chest pain associated with nausea, sweating, dyspnea and dizziness.  (R. 525.)  After conducting x-rays, an EKG, and other tests, Dr. John Simmons diagnosed Hysmith as suffering from chest pain without evidence of acute ischemia or infarction, bradycardia, anxiety and depression, and mitral valve prolapse with dysautonomia.  (R. 523.)

14

The medical records indicate that Hysmith continued to receive treatment for his heart condition by Dr. Aliabadi and other medical personnel, including a certified registered nurse practitioner, at Heart South, P.C.  On July 18, 2007, the nurse practitioner conducted a follow-up examination and assessed:

(1) Complaints of atypical chest discomfort.

(2) Mild sinus bradycardia.

(3) Underlying right bundle branch block.

(4) History of mitral valve prolapse.

(5) History of documented normal coronary arteries.

(6) History of syncope.  He was felt to have dysautonomia and has been evaluated by Dr. Gayle in the past.  He has been placed on Fluorine, Donnatal, and Gavitrol in the past, but unfortunately is unable to afford any of his medications.

(7) Other medical problems.

(R. 586-87.)

In a November 8, 2007, letter, Dr. Aliabadi advised that Hysmith should be considered permanently and completely disabled due to his cardiac history, including history of recurrent episodes of severe weakness, dizziness, dyspnea, and syncopal episodes "felt to be secondary to dysautonomia," as well as a history of mitral valve prolapse, bradycardia, right bundle branch block, and a history of anxiety disorder.  (R. 570.)

On August 4, 2008, Hysmith returned to Heart South for a follow-up appointment. Upon conducting an examination, the nurse practitioner assessed:

15

(1) Chronic complaints of severe weakness, dizziness, and syncopal events – he has not actually had a loss of consciousness since his last visit. He did have a fall at one point secondary to dizziness. His symptoms are felt to be secondary to dysautonomia.

(2) History of mitral valve prolapse.

(3) Right bundle branch block.

(4) Anxiety disorder.

(5) Chronic significant tobacco abuse.

(6) Chronic excessive caffeine intake.

(7) Other medical problems.

(R. 585.) She also noted that "from a cardiac standpoint [Hysmith] is stable." (R. 585.)

During a follow-up appointment on November 17, 2008, Dr. Aliabadi assessed that Hysmith suffered from several conditions, including continued complaints of severe weakness, dizziness/near syncope, and recurrent falls. (R. 590.) On that same day, Dr. Aliabadi wrote a letter which stated the following:

> Mr. Hysmith is a 35-year-old gentleman who is followed at Hearts South, P.C. He has history of recurrent episodes of severe weakness, dizziness, dyspnea, and syncopal episodes. His syncope is felt to be secondary to dysautonomia. He also has a history of mitral valve prolapse, bradycardia, right bundle branch block, and a history of anxiety disorder.

> Due to Mr. Hysmith's cardiac history, he needs to be considered permanently and completely disabled.

(R. 588.)

On March 29, 2009, Dr. Vijay C. Vyas, an internist, conducted a consultative evaluation. During the examination, Hysmith reported that he suffers from dizziness and

16

weak spells lasting approximately thirty minutes at a time at least two to three times a week and that he suffers from heart palpitations. (R. 625.) He also reported that he is unable to afford medication or medical treatment. (*Id*.) Upon reviewing the medical records before him and completing his examination, Dr. Vyas' impression was (1) cardiac arrhythmia, possible PACs and PVCs; (2) previous history of syncopal episode, etiology unknown; (3) heavy smoker with chronic bronchitis; (4) arthralgia, it seems very insignificant; (5) history of bipolar personality; and (6) fungal rash on abdominal wall.

In his analysis, the ALJ relied on Dr. Vyas' diagnosis of arrhythmia without an assessment of any other current impairments, when discounting Dr. Aliabadi's opinion that Hysmith's dizziness, weakness, and fainting spells are disabling. The ALJ's discounting of Dr. Aliabadi's opinion based on the lack of a current diagnosis by a medical specialist is incorrect. It is clear that Dr. Aliabadi relied on Dr. Gayle's opinion that Hysmith suffers from substantial dysautonomia when determining that Hysmith's recurrent episodes of fainting spells, dizziness, and severe weakness are disabling. Dr. Gayle is an expert in the field of cardiac electrophysiology. The ALJ ignored Dr. Gayle's opinion, as well as medical records indicating that Hysmith suffers from recurrent heart problems, when determining that Hysmith does not suffer from a current impairment. The ALJ is not free to simply reject a physician's opinion without reason, nor may he pick and choose between the opinions selecting those portions which support his ultimate conclusion. The ALJ must conscientiously probe into, inquire of, and explore all relevant facts to elicit both favorable and unfavorable facts for review. *Cowart v. Schweiker*, 662 F.2d 731, 735-36 (11th Cir. 1981).

17

Moreover, an administrative law judge has a duty to develop a full and fair record. *Kelley v. Heckler*, 761 F.2d 1538 (11th Cir. 1985).   The record is replete with references to Hysmith's dysautonomia and other conditions which may affect his ability to perform work. It is error for the ALJ to fail to obtain additional testing or otherwise develop the evidence, if that information is necessary to make an informed decision.  *See Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988).  Because the ALJ failed to consider the effects of Hysmith's dysautonomia on his ability to work, the court cannot conclude that the ALJ's determination that Hood has the residual functional capacity to perform medium work is supported by substantial evidence.

Given that the Commissioner failed to properly consider Dr. Aliabadi's opinion that Hysmith's heart condition, dysautonomia, and other medical problems severely impact his ability to perform work or fully develop with record with respect to Hysmith's dysautonomia, failed to properly consider the consultative psychologists' diagnoses of mental impairments separately and in combination, ignored Dr. George's opinion concerning the effect of Hysmith's mental condition on his ability to perform work when determining Hysmith's mental impairments are non-severe, and failed to consider Hysmith's inability to afford medical and mental health treatment, it is impossible for the court to determine whether the Commissioner's decision to deny benefits was rational and supported by substantial evidence. The court therefore concludes that this case is due to be remanded.

**V.  Conclusion**

Accordingly, this case will be reversed and remanded to the Commissioner for further

proceedings consistent with this opinion.

A separate, final judgment will be entered.

Done this 29th day of July, 2011.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

19